LAND, Justice.
 

 Plaintiff, as beneficiary, sues for the payment of the face of an accident and health policy, on the ground that her husband, Walter' P.. Wildblood, had been killed as a result of an accident. The demand was resisted by defendant company, the defense being that Wildblood was killed, not accidentally, but as the result of an intentional act of a third person, whose identity is unknown; and further, that when he was killed he was under the influence of an intoxicant, and, because of the provisions of the policy to that effect, there was no liability under the policy.
 

 Judgment was rendered in the court below m favor of plaintiff, and defendant company has appealed.
 

 As the case involves questions of fact, and the testimony is conflicting, the preponderance of the evidence is dependent upon the credibility of the witnesses, whom the trial judge saw and heard on the trial of the case.
 

 As the judge of the lower court was in much better position to pass upon the credibility of the witnesses, who appeared before him, than are the members of this court, we have decided to adopt as our own the following well-considered opinion handed down in the case:
 

 “The plaintiff sues, as beneficiary of a policy of insurance issued to her husband, Walter P. Wildblood, on May 26, 1929. The policy provides indemnity for accidental injury or death and for loss of time by reason of illness. It includes certain restrictions as to the cause of injury, those germane to this case being the following:
 

 “‘This policy does not cover any loss * * * (2) if the injury * * * causing it is received * * * while under the influence of any intoxicant; (3) if the injury causing it results from the intentional act of the Insured or of any other person excepting, however, assaults committed upon the Insured for the sole purpose of burglary or robbery.’
 

 “On February 23, 1932, while the policy was in force, Mr. Wildblood met his death at the hands of an unknown assassin. The theory of the plaintiff is that the assassin did not intend to murder her husband, but
 
 *205
 
 mistook him for .another man whom he did intend to murder, and therefore the death was not the intentional act of any person, within the .meaning of the policy. The defense is that the assassin did exactly what he intended to do; and the further defense is made that the insured was under the influence of intoxicating liquor at the time he met his death.
 

 “Murder is an intentional act; and ordinarily an insured losing his life by such an act comes within the exception of the policy sued on here; for the intention of the insured and of a third person need not / concur to comply with the exception. Joyce, Vol.
 
 4,
 
 p.
 
 4347;
 
 Colley, Vol. 6, p. 5364.
 

 “But there is divergence of opinion when the insured is shot under the mistaken belief that he is another person. In our own State, in Brooks v. Continental Casualty Co., 13 La. App. 502, 128 So. 183, 185, it was held that when an officer intended to shoot a fleeing man in the legs, in order to capture him, but actually shot him in the back and killed him, the killing was not intentional, and the insurance company was not relieved of liability under the policy. The Court reviews Louisiana cases, and remarks, ‘The criterion of responsibility is based * * * on the unintentional result.’ And Judge Elliott, concurring, says: ‘The insured is entitled to recover, where the injury was not specifically and particularly directed at him, because, if it was not, then he was not the intentional recipient of the act.’
 

 “Couch, Vol. 6, § 1240, is very clear on the point, citing numerous authorities. See, also, Mah See v. North American Ace.' Ins. Co., 190 Cal. 421, 213 P. 42, 26 A. L. R. 123, where the reported case is fully annotated, with the almost unanimous opinion of the authorities supporting the proposition. The same rule is supported by authorities annotated in 14 R. C. L. 371-437.
 

 “The interpretation thus placed upon the provisions of the policy
 
 not only
 
 appears reasonable, but in event the provisions should be considered of doubtful meaning, the interpretation is justified by the principle that doubtful provisions of the policy are construed favorably to the insured. Moreover, a just consideration of the intention of the contracting parties, drawn from the policy as a whole, leads to the conclusion that in framing the exception they did not have in mind nor intend to include the rare instance of the murder of the insured by one intending the murder of another. Doubtless the reason of the exception is to exempt the insurer from liability for such cases as the intentional death of an insured who is predisposed to brawls or whose associates are of the turbulent type, or who is likely to be the victim of vengeance for his own misconduct. The much more rare ease of death by reason of mistaken identity, or where improper habits or associates have no effect in increasing the hazard, was not contemplated by the parties. This is illustrated by the exception to the exception, which provides that the insurer shall be liable in case of intentional murder committed solely for the purpose of robbery or burglary — a murder with which the habits or character of the insured could have no causal connection.
 

 “Under this view of law, the question becomes one of fact — Whether the assassin of
 
 *207
 
 Mr. Wildblood intended his death, or the death of another for whom he mistook his victim. And from the nature of the case, the fact can be found only by a search for circumstances, and a consideration of inferences drawn from them; for guilt has sealed the lips of the assassin and death the lips of his victim.
 

 “A primary election was being held in a small building near Dido, Vernon Parish. It is situated at a cross-roads, about twenty five feet from Gravel Highway No. 22 on the north and twelve feet from a dirt road on the east. The dirt road extends southward 40 or 50 yards to a railway crossing, and beyond, passing near a small depot building and the home of Charles Gibson, a deputy sheriff, claimed by plaintiff to have been the intended victim of the assassination. To the southeast of the building, and within 30 or 40 feet, is a group of three oak trees, set in the edge of a brushy area bordering the clearing within which stands the small building. In front of the building, near the intersection of the roads, a small fire was maintained during the day for the brewing of coffee.
 

 “Mr. Wildblood was a section foreman on the railroad. On the day he met his death, his crew was at work near the polling place. They came in a railway motor car in the morning, and left it on the side track near the depot building, some 50 or 60 yards from the building in which the election was being held. During the day, Mr. Wildblood made several trips between these two points. While he was not a voter in Vernon Parish, he knew and was known by many of those who were. He appears to have been of a jovial disposition, enjoying the rough give and take of an idling country crowd; but in his cups he was inclined to lose his joviality in a somewhat ill-tempered belligerency.
 

 “Considerable drinking occurred among the crowd during the day. Mr. Wildblood joined in it to some extent, early in the day, but there is no evidence that he was greatly under the influence of liquor, at least during the latter part of the day.
 

 “At about 8:00 o’clock in the evening, Mr. Wildblood walked from a point near the intersection of the roads, southward along the edge of the dirt road. When near the two oak trees, 20 to 25 feet from the southeast corner of the building, he was shot down and killed. Fifteen buck shot struck him in the right side, within a space no larger than an outspread hand. Shotgun wadding was found near the body. The shot must have been fired from a short distance, and from his right — probably from the shadow of the three trees 30 or 35 feet to the eastward.
 

 “The circumstances relied upon by the plaintiff to establish her theory that the shot which killed her husband was intended for Charles Gibson are, briefly: That Gibson’s life had been threatened; that he was in the crowd at the polling place during the day; that the two men were of similar size, build and dress; that the light was faint; that her husband was going away from the direction of his own home, and toward Gibson’s home; •and that her husband possessed no enemies who might desire his death.
 

 “The circumstances claimed by the defendant are that Gibson left the scene and went to his home early in the afternoon; that he is a smaller man than Wildblood, without sim
 
 *209
 
 ilarity of dress or appearance; that the light was sufficient to prevent mistake in identity at a distance of 30 or 35 feet; that Wild-blood was drinking and quarreling some during the day; that he had angered several persons; that no attempt had previously or subsequently been made on the life of Gibson ; and that there is no reason shown why anyone would wish the death of Gibson more than the death of Wildblood.
 

 “It is true that a friend told Gibson that his life was in danger, and it is true that he went home early and stayed there in order to avoid that danger. That the neighborhood had previously heard of threats against him is indicated by the fact that on one occasion, when a gunshot was heard in his field, a neighbor ran over to see if some one had shot him.
 

 “That the two men did not differ greatly in size is also true, although Wildblood was somewhat taller and larger. Their dress was equally neutral in color except the hats. Several witnesses insist that Wildblood wore a large white hat; but Mrs. Wildblood says ■that he did not own such a hat, but did own and wear a large black hat, which was the type and color worn by Gibson.
 

 “That Wildblood, when shot, was walking in the direction which Gibson would be expected to take on his way home (in'order to walk home) along the railroad track.
 

 “That the light was dim at the time of the tragedy is also true. Wildblood may have come from the vicinity of the fire in front of the building; but it had died almost to embers, and at any rate the building stood between the fire and the point from which the shot was fired. The body of Wildblood fell almost at the feet of two oak trees which further obscured the firelight. His figure was within the view of the assassin about 15 feet, or only a few seconds, before being shot down.
 

 “These facts clearly indicate that the assassin might have mistaken Wildblood for Gibson. They may be said to raise a probability, unless reason is found for assuming that Wildblood had created violent enemies, either previously or by his conduct on the day of his death. There is no evidence that he had been involved in any previous difficulty. His jovial disposition was spoken of by several witnesses, although it appears that when drinking he was inclined to be ‘joking and fussy’ as one witness expressed it.
 

 “The witness Smith furnished the only testimony to affect his standing in the community. He says Wildblood was not liked, and that he was inclined to be a bully when drinking. While Smith is intelligent and apparently not intentionally untruthful, it is true that he had interested himself in assisting the defendant to procure witnesses; and he was contradicted by Gibson when he denied that he knew of threats against Gibson.
 

 “Evidence of Wildblood’s conduct on his last day is conflicting. That he was drinking with several others in the crowd is doubtless true; but this appears to have occurred in the early part of the day; and it is certain that during the afternoon he drank coffee more than once. There is nothing to indicate that his conduct differed from that of others in the crowd, or from that usual to himself, except two incidents, about which there is conflicting testimony.
 

 
 *211
 
 “The first instance is recounted by Smith as a serious dispute between Wildblood and Gibson. He says the two men did not like each other, that Wildblood tried to pick a fuss, said he had two pistols and would loan Gibson one, and finally Gibson called Johnson, who, the witness said, took Wildblood away.
 

 “Gibson’s account of the incident is very different. There was nothing unfriendly in the talk between them. Wildblood left with Johnson, and Smith joined them 30 feet away. W. J. Hall, another witness, makes the incident a little more serious, but according to him, it ended in a friendly manner. Wildblood was ‘fussy’ but walked away without attempting an encounter.
 

 “The other incident is when Wildblood is said to have kicked Bill Miller’s boy. Smith says he saw him do it, but gives no details. Calvin Doyle also saw it. The boy was as large as a small man. Wildblood desisted when the boy threatened to cut him. There is no indication that the boy was injured.
 

 “Some witnesses tell of the election officers having ordered Wildtílood out of the room; but it appears that a number of men were crowded in, disturbing the election, and Wildblood went out peaceably with the others.
 

 “Any one familiar with such scenes would have no trouble in recasting the occurrences of the day. Most of the men and boys of the neighborhood were there to ‘make a day of it.’ There was considerable drinking and boisterous joking, with occasional fits of ill-temper. When the play became too rough, arousing the anger of some one, bystanders intervened and the trouble ended. No one expects parlor politeness of such crowds on such occasions, and the lack of it should not be imputed against them.
 

 “It seems probable that an enemy planning assassination on such an occasion would be careful not to show himself in the crowd. If he expected his intended victim to be there, he would approach in the dark, conceal himself at a vantage point, and await his opportunity. Under these circumstances, it would have been easy to mistake Wildblood for Gibson; and assuming that Wildblood had done something during the day to put murder into the heart of some one present— which does not seem probable — he would have directed suspicion to himself as the assassin, by becoming angered and leaving the crowd.
 

 “It is impossible, of course, to be certain; but the known threats against Gibson, the probability that he would be at the point of assassination when Wildblood met his death, the surrounding which made it difficult to distinguish between the two men, and the lack of known enemies to Wildblood, raise a reasonable probability that the fatal shot was intended for Gibson.
 

 “The defense of intoxication is not established. It is shown that Wildblood was drinking earlier in the day; but there is no evidence, that he was under the influence of liquor in any degree at the time of the tragedy.
 

 “It is therefore ordered, adjudged and decreed that the plaintiff, Carrie Wildblood, have judgment against the defendant, Continental Casualty Company, in the sum of Two Thousand Three Hundred fifty-six and
 
 *213
 
 60/100 Dollars, with five per cent per annum interest from February 23, 1932 until paid, and costs.”
 

 We adopt as our own the reasons assigned for judgment in the above opinion written by the able trial judge, and find, no error in the judgment appealed from in this case by defendant.
 

 Judgment affirmed.