295 So.2d 10 (1974)
Frances TORNABENE
v.
ATLAS LIFE INSURANCE COMPANY, INC.
No. 6163.
Court of Appeal of Louisiana, Fourth Circuit.
May 10, 1974.
Rehearing Denied June 6, 1974.
Writ Refused August 28, 1974.
Lambert J. Hassinger, New Orleans, for plaintiff-appellee.
Reuter & Reuter, Arthur C. Reuter, New Orleans, for defendant-appellant.
Before BOUTALL and MORIAL, JJ., and MARCEL, J. Pro Tem.
CLEVELAND J. MARCEL, Sr., Judge Pro Tem.
There is an action brought by the designated beneficiary under four policies of insurance issued by defendant to secure accidental death benefits under those four policies. Plaintiff sought the stipulated amount of $3,500, penalty for non-payment, and attorney's fees. Defendant contends that the insured, Salvador Tornabene died as a result of bullet wounds intentionally *11 inflicted, and not as a result of an accident. The trial court rendered judgment for the plaintiff in the amount of $3,500, but refused to award penalty or attorney's fees. Defendant appeals. Plaintiff has neither appealed nor answered the appeal. We affirm the judgment of the trial court.
The decedent, Salvador Tornabene, was a taxi driver for United Cabs in New Orleans. L. J. Delsa, a detective with the New Orleans Police Department, testified that while he was driving on his way home from work on March 11, 1971, at about 12:30 a. m., in the vicinity of Elysian Fields and Filmore he saw a cab make a left turn from Elysian Fields on to Filmore, and stop for a red light. When the light turned green, the cab ran against traffic for about 45 feet and pulled up in front of Parnell's Lounge. He did not see anyone in the cab other than the cab driver. The only people he noticed near Parnell's Lounge were a young man talking on a public telephone on the corner and a lady in a car parked by the telephone. The area of the lounge was lighted by a florescent light reading "Parnell's".
On March 11, 1971, at about 12:30 a. m., Patrick Bachemin was in a telephone booth at the corner of Elysian Fields and Filmore calling his wife. He saw a United Cab drive into the parking lot at Parnell's Lounge. The cab driver got out of the cab and walked toward the door of Parnell's Lounge. Bachemin never saw him enter. The driver walked back to the cab and opened the door. No one got out of the cab with the cab driver, and no one came back to the cab with him. Bachemin saw no one in the vicinity of the cab. He heard no shots or screams of any kind. Bachemin left the telephone booth soon after the cab driver got back into the cab. Waiting for Bachemin in Bachemin's car was his sister, Gayle Bachemin (who was not called as a witness). Bachemin got back into his car and drove away.
Roy Gugenheim and Ronald Iannazzo of the New Orleans Police Department were partners in the investigation of an alleged accident that took place in the parking lot of Parnell's Lounge near the corner of Elysian Fields and Filmore. They arrived on the scene at about 12:30 a. m. on March 11, 1971. They saw a United Cab against a fence, and also against an apartment building. They pulled up right beside the cab. The engine was still running, and the lights were still on. Both believed they remembered that one of the rear doors of the cab was open. They saw what they believed to be the driver of the cab (and who it later developed was Salvador Tornabene, the driver of the cab) lying with his head on the driver side of the cab and the rest of his body on the passenger's side. There was a hole in the back of Tornabene's head. (It was later found that there were two bullet wounds in the back of his head.) Gugenheim spoke to the patrons of Parnell's as they came out (the Lounge was closing for the night) and no one admitted having been in the cab. There were no bullet holes in the cab, or in the windshield. No shell casings were found in the cab or around it.
Dr. Waldo Bernard, Assistant Coroner for the Orleans Parish Coroner's Office went to the scene of a death on March 11, 1971, at 3514 Elysian Fields Avenue. He arrived at the scene, a parking lot, at 1:30 a. m. He found the deceased in a taxicab with a gunshot wound on the side of the head. There were two bullet wounds. The victim was identified as Salvador Tornabene. Mr. Tornabene was pronounced dead. The belongings of the deceased were removed. Dr. Bernard did not remember what those belongings were. An autopsy was performed that morning. There were no powder burns, and there was no exit wound.
Peter Hand, night supervisor for the detective bureau of the New Orleans Police Department, arrived at the vicinity of Elysian Fields and Filmore Avenues at about 12:30 a. m. He saw a United Cab heading into the fence. He examined the cab himself and did not discover *12 any type of shell casings. He could not see any powder burns on the victim's head. A representative of the Coroner's Office came, Dr. Bernard. As Peter Hand recalls, the doctor removed from the body of the victim, a wrist watch, two yellow metal rings, one from each hand, cash in the amount of $24.00 or $25.00 from his top pocket, a wallet, and some additional cash from his pants pocket.
The area of the shooting, Parnell's Lounge parking lot, was lighted by vapor lights on Elysian Fields Avenue and a large florescent light in front of Parnell's Lounge.
The four insurance policies upon which the present action is based were introduced in evidence as Exhibits Plaintiff 1, Plaintiff 2, Plaintiff 3, and Plaintiff 4. All cover accidental death. Policies Plaintiff 1 and Plaintiff 2, however, exclude from coverage loss of life caused directly or indirectly, wholly or partly by "* * * the intentional action of any person other than the insured; * * *". Policies Plaintiff 3 and Plaintiff 4 in a similar manner exclude from coverage death resulting directly or indirectly, wholly or partially from "* * * violence intentionally inflicted by another person; * * *". (All policies contain other exclusions, not pertinent, as well.) Although the language of the quoted exclusions differs somewhat between policies Plaintiff 1 and Plaintiff 2, and policies Plaintiff 3 and Plaintiff 4, for purposes of this decision we find no difference in the meaning of the quoted exclusions, and treat both types of exclusions as covering the same type of loss, viz., death resulting wholly or partly from an "intentional act" of a person other than the insured.
As we understand defendant's position, defendant contends that the death of the insured, Salvador Tornabene, was not accidental, or, if it was accidental, it resulted from the "intentional act" of someone other than the insured, and hence, falls within the quoted exclusions.
The trial court found that the decision in Chambers v. First National Life Ins. Co., La.App., 253 So.2d 636 (1971), was controlling. We believe that the trial court was correct in so holding.
In Chambers, the insured had a policy of accident insurance that provided for accidental death benefits. The policy contained an exclusion which excluded "* * * death * * * caused by the intentional act of the insured, or any other person, while sane or insane". The insured was seated at a bar when a man entered the bar from the insured's rear, walked toward him, emptied a pistol into the insured's back without seeing his face, and then walked out, without saying a word. The insured died. No motive could be found for the killing. An action was brought under the accident policy. This court held that plaintiff had the burden of proving death by violent and external means unforeseen by the victim, to show that death was "accidental". Then the burden shifts to the defendant to prove that death falls under the "intentional act" exclusion by showing both that (1) the killing was intentional and (2) that the actual victim was the intended victim. The court held that in that case it had not been shown that the actual victim was the intended victim.
In the present case the plaintiff has shown that Salvador Tornabene died by violent and external means unforeseen by the victim, Tornabene. The death, therefore, was accidental, and the policies afforded coverage unless the "intentional act" exclusion applies. But the "intentional" exclusion does not apply since the defendant has not met the burden of proof. Defendant must show both that the killing was intentional and that the actual victim was the intended victim. Defendant has shown neither. There is nothing in the record that would indicate that either is the case.
Coming before the Chambers case in time and lying behind it in reasoning are the decisions in Wildblood v. Continental *13 Cas. Co., 182 La. 202, 161 So. 584 (1935); Brooks v. Continental Cas. Co., 13 La.App. 502, 128 So. 183 (1930); and Denies v. First National Life Ins. Co., La.App., 144 So.2d 570 (1962).
In Wildblood, plaintiff, as the beneficiary under a health and accident policy issued by defendant, sued for payment of the face amount of the policy on grounds that her husband, Walter D. Wildblood, had died accidentally. It appears that Wildblood died of a gunshot wound. The insurance policy stated, "This policy does not cover any loss * * * (3) if the injury causing it results from the intentional act of the Insured or of any other person excepting, however, assaults committed upon the Insured for the sole purpose of burglary or robbery." Plaintiff contended that Wildblood was mistaken for one Charles Gibson, whose life had been threatened, and who was of about the same height and build as Wildblood. The trial court rendered judgment for the plaintiff. The defendants appealed. The Louisiana Supreme Court adopted the opinion of the trial court as its own. The trial court had held that if the insured was shot in the mistaken belief that he was another person, the "intentional act" exclusion did not apply. It then had found that the facts raised a reasonable probability that the fatal shot was intended for Gibson.
We note that this opinion by implication of its reasoning may place upon the plaintiff the burden of showing "reasonable probability" that the intended victim was another person. However, we do not so interpret the case. First, the opinion of the Supreme Court was an adopted opinion of the trial court. Second, there is nothing in Wildblood that would indicate that the question of burden of proof was ever raised in argument. We interpret Wildblood simply as holding that the "intentional act" exclusion does not apply if the actual victim was not the intended victim.
Counsel for defendant contend that Wildblood supports the proposition that an "intentional act" exclusion is a valid exclusion where it is shown that the insured was murdered. We find nothing in Wildblood that would lend itself to this analysis. In Wildblood, in all probability, the victim was "murdered", if murder is used in the criminal law sense. Yet the exclusion was held not to apply.
In Brooks the insured, Moses Brooks, had an accident policy of which the plaintiff was the designated beneficiary. The policy provided, "This policy does not cover any loss * * * if the injury causing it results from the intentional act of the insured or of any other person * * *". Legendre, the deputy sheriff, received a call that a man had been robbed. He went to look for the robbers, and came across two men who fit their description. He said to them, "Wait there boys." Instead of stopping, the men ran. Legendre fired at the men, attempting to strike them in the leg. Instead, he struck the insured in the back, inflicting injuries of which the insured died a short time later. It was later discovered that the insured was not one of the robbers. The beneficiary sued under the policy. The Court of Appeal held the "intentional act" exclusion did not apply because, among other reasons, Legendre intended to shoot the holdup men, and by mistake shot the insured.
In Denies the insured had a life insurance policy, naming plaintiff as beneficiary, which insured against accidental death. The policy contained an exclusion which excluded from coverage, among other things, "* * * death or injury to the insured caused by the intentional act of the insured, or any other person while sane or insane; * * *". On July 22, 1956, the insured was involved in a fight involving a bar and grocery store owner, the insured, the insured's wife, and the insured's mother-in-law. At the last episode of the fight the insured's mother-in-law had a gun which she pointed at the insured. The insured advanced toward his mother-in-law, and the mother-in-law discharged the gun, striking the insured in the abdomen. The insured died moments later. The beneficiary sued to recover on the policy. This *14 court held that the burden was on the insurance company to prove the facts which it asserted exculpated it from liability under the exclusionary provision of the policy. The court found that the record did not establish whether the mother-in-law fired the fatal shot accidentally or merely to scare the insured or whether she actually intended to kill the decedent when she pulled the trigger. The judgment of the trial court in favor of the plaintiff was affirmed.
Thus the cases discussed above support the decision in the Chambers case. We find in the present case that defendant has not shown either that the killing was intentional or that the actual victim was the intended victim, as it must in order to prevent recovery.
The area of Parnell's Lounge was fairly well lighted in the present case. No one other than Bachemin and his sister were seen in the vicinity. No powder burns were found on the decedent's body. No exit wound was found. No shell casings were found in or near the cab. No shot was heard by Bachemin while he was talking on the telephone. Salvador Tornabene's wrist watch, rings, wallet and money (in the amount of about $25) were still on him. We do not know why or by whom Tornabene was shot, whether or not the shooting was intentional, or whether or not the actual victim was the intended victim. Clearly, the exclusion does not apply.
Defendant cites the case of Dusang v. Liberty Mutual Ins. Co., La.App., 195 So. 2d 340 (1967) as supporting the proposition that in civil suits the court is bound to evaluate the evidence upon the basis of what probably occurred rather than what possibly occurred. In that case, plaintiff, a journeyman carpenter, lifted, with the assistance of several other men, a marble table top weighing between 400 and 500 pounds. He felt a sharp pain in the left side of his chest. He continued to work, but that night he experienced severe pain in the chest area. The next day, he reported to work, and told the foreman of the pains. He was sent to Baptist Hospital, where he remained for several days. Plaintiff sued for benefits under the Workmen's Compensation Statute for total and permanent disability. At the trial, the experts called by plaintiff testified that an acute change in plaintiff's heart, without infarct, was brought about by his lifting the table top, and that damages in plaintiff's heart could be detected during the course of a series of electrocardiograms taken after the accident. They further testified that plaintiff could not return to his former employment. The experts called by defendant testified that the only injuries incurred by plaintiff were a sprained chest muscle and a possible fracture of a rib. This court held that the preponderance of the evidence disclosed that the plaintiff was left with a condition designated as angina pectoris which severely limited his ability to engage in any strenuous effort whatsoever. Then the court said:
"A civil suit is not a scientific investigation, and the Court in making its judgment predicates its evalution of the evidence upon what reasonably and probably occurred. In this case, the whole tenor of the expertize contained in the record leads us to the inevitable conclusion that the plaintiff's heart or parts thereof suffered damage resulting from the accident of June 4, 1964."
(195 So.2d 340, at 342.)
Thus, we see that the principle stated by defendant in the present case is simply a principle used in the evaluation of expert testimony in scientific matters. In the present case, there is no dispute in expert testimony. Furthermore, it is equally reasonable and probable that Tornabene was shot unintentionally or that he was not the intended victim of the shooting as that the opposite was the case.
Accordingly, the judgment of the trial court is affirmed, all costs to be borne by defendant.
Affirmed.